UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| FRANCISCO DE LUNA, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. M-10-268 |
| | § | |
| HIDALGO COUNTY, TEXAS, *et al*, | § | |
| | § | |
| Defendants. | § | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION FOR DENIAL
OF CLASS CERTIFICATION, GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR SUMMARY  JUDGMENT, AND DENYING
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
AND APPOINTMENT OF COUNSEL**

## I.     Introduction

Now before the Court are Defendants' Motion for Summary Judgment (Doc. 74); Defendants' Motion for Denial of Class Certification (Doc. 87); Plaintiffs' Motion for Summary Judgment (Doc. 90); and Plaintiffs' Motion for Class Certification and Appointment of Counsel (Doc. 91).  Plaintiffs Francisco De Luna and Elizabeth Diaz, individually and on behalf of all others similarly situated and pursuant to 42 U.S.C. § 1983, bring this suit to challenge alleged violations of their federal due process and equal protection rights by Mary Alice Palacios, Gilberto Saenz, Jesus Morales, Bobby Contreras, Rosa E. Trevino, Luis Garza, Ismael Ochoa, Charlie Espinosa, and E. "Speedy" Jackson, all sued in their official capacities, and by Hidalgo County.  (Doc. 23-1).[1]  At the time the lawsuit was filed, all nine of the individual Defendants were Hidalgo County Justices of the Peace ("JP"), seven of whom served on a rotating basis as Magistrates performing arraignments and authorizing the commitment of persons to the County

---

[1]  Plaintiffs' official capacity claims against Hidalgo County Sheriff Guadalupe Trevino were dismissed by the Court as redundant of those against the County.  (Doc. 50).

Jail.[2]  Soon after each of the named Plaintiffs turned 17 years old, JP Palacios mailed to their last-known addresses a notice to appear to answer to outstanding charges for failure to attend school and other school-rule violations committed when they were minors.  When each Plaintiff failed to appear, Palacios issued separate arrest warrants for each of the charges.  Plaintiffs were eventually committed to jail by order of the Magistrates presiding at their arraignments, and incarcerated for more than two weeks in the County Jail, for their failure to satisfy the accumulated fines and costs assessed against them for the school-related charges.  It is undisputed that both Plaintiffs were indigent at the time of their incarcerations.

Plaintiffs filed suit on July 26, 2010 and amended their complaint on November 9, 2010, seeking to represent the following proposed class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2):

> All individuals who have been or may in the future be adjudicated or processed for commitment to jail for unpaid fines or costs, pursuant to the provisions of Texas Code of Criminal Procedure Art. 45.046, while in the custody of the Hidalgo County Sheriff's Office.

(Doc. 1 at ¶ 161; Doc. 23-1 at ¶ 161).[3]  On their own behalf and on behalf of the class, Plaintiffs seek declaratory relief against the Magistrates and declaratory and injunctive relief against the County.  (Doc. 23-1 at ¶¶ 161-84, 191).[4]  Specifically, Plaintiffs seek a declaration that the Magistrates' alleged practice of ordering the incarceration of persons for nonpayment of fines and costs without determining whether they are indigent and have made a good faith effort to discharge the outstanding debt, and without offering alternatives to incarceration, violates the procedural due process and equal protection guarantees of Fourteenth Amendment to the U.S.

---

[2]  The Court will hereinafter refer to the individual Defendants as JPs and/or Magistrates.
[3]  Plaintiffs' class definitions and allegations are identical in both complaints.  *See* (Doc. 1 at ¶¶ 161-84; Doc. 23-1 at ¶¶ 161-84).
[4]  The Court dismissed Plaintiffs' claims for injunctive relief against the Magistrates as barred by judicial immunity.  (Doc. 50).

Constitution.  *Id.* at ¶¶ 168-84, 191.  Plaintiffs also seek a judgment declaring as unconstitutional and enjoining the County's alleged practice of processing, booking, and confining persons under these circumstances.  *Id.*  On their own behalf only, Plaintiffs seek damages from the County for its alleged violations of Plaintiffs' constitutional rights.  *Id.* at ¶¶ 185-89, 191.

Defendants filed the Motion for Summary Judgment on all claims against them on October 18, 2011, followed by the Motion for Denial of Class Certification on November 7, 2011.  (Docs. 74, 87).  Plaintiffs responded with their Motion for Summary Judgment and Motion for Class Certification and Appointment of Counsel, both filed on November 10, 2011. (Docs. 90, 91).  Upon review of the parties' Motions and responsive briefing, in light of the record and the relevant law, the Court finds that class certification must be denied and that Plaintiffs' individual claims for declaratory and injunctive relief against the Magistrates and the County must be dismissed because Plaintiffs lack standing to request this relief, either on their own behalf or on behalf of the class.  As to the named Plaintiffs' remaining claim for damages against the County, the Court finds that De Luna and Diaz are entitled to summary judgment on the claim that the County violated their federal due process and equal protection rights by failing to afford them an affirmative indigency determination before incarcerating them for their failure to pay fines and costs, but that De Luna may obtain only nominal damages resulting from his unconstitutional incarceration and that Diaz's entitlement to compensatory damages presents genuine issues of material fact that cannot be resolved on summary judgment.

II.     **Summary Judgment and Class Certification Evidence**[5]

A.     **Plaintiff De Luna**

1.     **Underlying "Class C" Offenses**

The "Class C," fine-only misdemeanors underlying De Luna's challenged incarceration include tickets for violations of the Texas Education Code, such as failure to attend school and failure to comply with school directives.  (Doc. 90, Ex. 12); *see* TEX. EDUC. CODE §§ 25.094(e), 37.102(c), 37.124(b).[6]  De Luna received the tickets from 2005 through 2007 while attending school within the Edinburg Consolidated Independent School District ("ECISD").  (Doc. 90, Ex. 12).  De Luna appeared before the Hidalgo County JP Court, and more specifically Defendant Palacios, on two separate occasions and signed an "Explanation and Waiver of Rights" form acknowledging and waiving his rights to remain silent, to a trial by jury, to face the state's witnesses and to bring his own witnesses, and to be represented by an attorney.  (Doc. 90, Ex. 11).  De Luna's mother, Elsa De Luna, also signed the forms, agreeing to be responsible for any fees and costs assessed against De Luna.  *See id.*  In 2007, Palacios transferred the tickets to the Hidalgo County Juvenile Court.  (Doc. 90, Ex. 13).  The parties dispute whether the tickets were resolved in the Juvenile Court.  (Docs. 74, 90, 105).

---

[5]  Plaintiffs and Defendants object to certain exhibits submitted in support of their respective Motions for Summary Judgment.  (Docs. 90, 105).  All of those objections are discussed herein, with the exception that the Court need not address Defendants' objections to exhibits that the Court finds unnecessary to consider in setting forth the contextual and determinative evidence in this case.  (Doc. 105; *see* Doc. 90, Exs. 5, 8, 14, 26, 27).

[6]  The Court overrules Defendants' "relevance" objections to the copies of De Luna's tickets and other evidence submitted by Plaintiffs relating to the adjudication of their underlying charges, as this evidence provides necessary context to Plaintiffs' individual and class-wide claims.  (Doc. 105; *see* Doc. 90, Exs. 12, 13, 18, 19, 29).

2.      **Notice of Continuing Obligation to Appear**

It is undisputed that De Luna could not be incarcerated as a juvenile for the ticketed offenses.  *See* TEX. CODE CRIM. P. Art. 45.060(a).   However, the Texas Code of Criminal Procedure provides in relevant part as follows:

> (b) On or after an individual's 17th birthday, if the court has used all available procedures under this chapter to secure the individual's appearance to answer allegations made before the individual's 17th birthday, the court may issue a notice of continuing obligation to appear by personal service or by mail to the last known address and residence of the individual. The notice must order the individual to appear at a designated time, place, and date to answer the allegations detailed in the notice.
>
> (c) Failure to appear as ordered by the notice under Subsection (b) is a Class C misdemeanor independent of Section 38.10, Penal Code, and Section 543.003, Transportation Code.
>
> (d) It is an affirmative defense to prosecution under Subsection (c) that the individual…did not receive notice as required by Subsection (b).
>
> ….

*Id.* Art. 45.060(b)-(d).   Under this authority, Palacios issued a "Notice of Continuing Obligation to Appear" ("NCOA") to De Luna on December 17, 2008, soon after he turned 17 years old. (Doc. 90, Ex. 29).  De Luna claims that he did not receive the NCOA.  (Doc. 90; *see* Doc. 90, Ex. 10 at pp. 6-7).  When De Luna did not appear in response to the NCOA, Palacios issued a separate "capias pro fine," or arrest warrant, for each of the school-related tickets.  (Doc. 90, Ex. 6 at pp. 90-91).

3.      **Arrest**

Approximately two years later, on January 11, 2010, De Luna was arrested as an adult for public intoxication and taken to the Hidalgo County Jail.  (Doc. 74 at ¶ 7; Doc. 90; Doc. 90, Ex. 15 at ¶ 5).  Elsa De Luna states in her affidavit that she spoke with jail officials over the phone who told her that De Luna "had over $10,000 in truancy tickets and that he had to pay them or

stay 101 days." (Doc. 90, Ex. 15 at ¶ 6). When Ms. De Luna explained that her son had already served probation for truancy and that "those ticket cases were over," she was instructed to call Palacios's court. *Id.* Ms. De Luna states that "I contacted her court and they would not listen to me. I do not remember who I spoke to, but I was told that my son had to pay the entire amount or stay in jail for 101 days." *Id.*[7]

Plaintiffs contend that De Luna "asserted his indigency" during the booking process by answering "no" to the question of whether he could afford an attorney on a form entitled, "Hidalgo County Sheriffs Department Questions Regarding Attorney Information." (Doc. 90; Doc. 90, Ex. 16).[8] When questioned during his deposition, De Luna stated that he told "no one" at the Sheriff's Office that he could not afford to pay his tickets. (Doc. 74, Ex. H at pp. 30-31).

## 4.    Arraignment

Soon after his arrest, De Luna was arraigned, or "magistrated," by Defendant Trevino via videoconference. (Doc. 90, Exs. 10, 17). Trevino began the arraignments by providing all of the defendants present, including De Luna, with the required admonishments regarding their rights to the assistance and appointment of counsel, to remain silent, and to have a trial. (Doc. 90, Ex. 10 at p. 2). The defendants collectively acknowledged that they understood these rights. *Id.* Trevino then proceeded to call each defendant individually. *Id.* With respect to De Luna, the transcript of the arraignment provides in relevant part as follows:

> Trevino:    You were brought in on a public intoxication…plus you have over 20 cases with Mary Alice Palacios.

---

[7]  Defendants object to this portion of Ms. De Luna's affidavit as containing hearsay, but what jail officials and the court told her are admissible as admissions by party-opponents. (Doc. 105); *see* FED. R. CIV. P. 801(d)(2).

[8]  The Court overrules Defendants' objections to the copy of this form as containing hearsay and lacking in authentication, as deposition testimony discussed *infra* indicates that it is a standard County form. (Doc. 105); *see* FED. R. EVID. 803(5), 901(b)(1). Further, Defendants cannot seriously contest the authenticity of a form produced by the County itself.

De Luna:        Yes ma'am.

....

Trevino:        Were you aware that you had all these arrest warrants with Mary Alice Palacios?

De Luna:        Ugh...no I never...I didn't get anything.

Trevino:        Did you ever go before Mary Alice Palacios?

De Luna:        Yes ma'am.

Trevino:        Ok.  Well she assessed fines but I guess you never went back to pay them so she assessed warrants these are outstanding warrants that you have with Judge Palacios.  You have one from 2008, they are all from 2008.  The first one is on a failure to comply with directives, excessive tardiness, failure to attend school, fail to attend school, fail to attend school, fail to attend school, fail to attend school, fail to attend school, failure to comply with directives, fail to comply with directives, fail to attend school, fail to comply with directives, fail to attend school, fail to comply with directives, fail to comply with directives, abusive language in school, abusive language in school, fail to comply with directives, abusive language in school, rules and penalties, fail to comply with directives, disruption of class, fail to attend school, fail to attend school, guilty or not guilty?

De Luna:        Guilty.

Trevino:        Ok.  For the 1st P.I. the court is going to assess a $200 fine, and then I am going to give you the amounts that Mary Alice Palacios is assessing $407 for the first fail to attend, $407 for the excessive tardiness, $533 for the fail to attend, $533 for the fail to attend, $533 for the fail to attend, $533 for the fail to attend, $533 for the fail to attend, $533 for the fail to attend, $416 for fail to comply with directives, fail to comply with directives $416, fail to attend school $533, fail to comply with directives $416, fail to attend school $533, fail to comply with directives $416, fail to comply with directives $416, abusive language at school $416, abusive language at school $416, fail to comply with directives...[$]416, abusive language $416, rules and penalties $416, fail to comply with directives $416, disruption of class $416, fail to attend school $533, fail to attend school $537.  Do you have any questions?

De Luna:        Umm.  No ma'am.

Trevino:        Thank you Sir.

*Id.* at pp. 6-8.  De Luna admitted in his deposition, as the transcript reflects, that he did not tell Trevino that he could not afford to pay the tickets.  (Doc. 74, Ex. H at pp. 30-31).  Trevino signed 25 separate Class C commitment orders, one for the public intoxication charge and 24 for the school-related tickets, committing De Luna to jail for "the time required by law to satisfy the amount of such fine and costs."  (Doc. 90, Ex. 18).  The Sheriff's Office calculates this time at $100 per day.  (Doc. 90, Ex. 3 at p. 42; Ex. 9 at pp. 64-65).

**5.      Incarceration and Damages**

Plaintiffs allege and Defendants do not dispute that De Luna was incarcerated in the Hidalgo County Jail for 18 days, which was less than the full amount of time necessary to discharge his fines due to the intervention of the County Public Defender, who submitted a writ of habeas corpus and secured De Luna's release "from further illegal confinement."  (Doc. 23-1 at ¶¶ 114-15).  Plaintiffs submit the report of psychologist Stephen Thorne, Ph.D., in support of their contention that De Luna suffered "anxiety and fear" during his time in jail.  (Doc. 90; Doc. 90, Ex. 23).  Dr. Thorne's report concludes that "while Mr. De Luna does not endorse or describe specific psychiatric impairment resulting from his January 2010 detainment in the Hidalgo County Jail, it does seem reasonable to infer that his overall social functioning, as well as his motivation to engage in healthy and prosocial activities outside of the home, has, in some ways, been impacted by the circumstances relating to his detainment."  (Doc. 90, Ex. 23).  When asked at his deposition if De Luna suffered from posttraumatic stress, Dr. Thorne responded, "no."  (Doc. 77, Ex. O at pp. 181-82).  When asked if De Luna suffered from stress of any kind as a result of his incarceration, Dr. Thorne responded that he "probably maybe changed his social patterns a little bit, but I don't think there's any kind of significant clinical stress or anxiety or

anything like that." *Id.* at p. 182.  He went on to say that "I can't point to any damages…that I think are the result of his being detained." *Id.* at p. 185.

**B.    Plaintiff Diaz**

**1.    First Three Underlying Class C Offenses and NCOA**

The evidence reflects that in 2006, ECISD issued two tickets to Diaz for failure to attend school, and that Diaz was ticketed again in 2008 for the same offense.  (Doc. 90, Ex. 20 at pp. 8, 25; Ex. 21 at ¶ 3; Doc. 74, Ex. B; Doc. 75, Ex. L); *see* TEX. EDUC. CODE § 25.094.[9]   Diaz appeared before the Hidalgo County JP Court, and more specifically Palacios, in December 2006 and March 2008 and signed an "Explanation and Waiver of Rights" form on each occasion.  (Doc. 90, Ex. 11; Ex. 20 at p. 11).  By also signing the form, Diaz's mother, Adelita Hernandez, agreed to be responsible for any fees and costs assessed against Diaz. *Id.*  Hernandez states in her affidavit that she was under the impression that these fines were resolved "because [Diaz's] absences from school were due to health problems and should have been excused."  (Doc. 90, Ex. 21 at ¶ 4).[10]   However, Plaintiffs do not directly dispute that Diaz did not satisfy the fines associated with the tickets, or any alternate sentencing afforded, while she was a juvenile. *See also* (Doc. 90, Ex. 20).  On January 27, 2009, soon after Diaz turned 17 years old, Palacios issued the NCOA ordering Diaz to appear to answer to the three outstanding charges.  (Doc. 90, Ex. 20 at p. 33; Ex. 29).  Plaintiffs claim that Diaz did not receive the NCOA because the address the court had for her was incorrect.  (Doc. 90; Doc. 90, Ex. 21 at ¶ 4).  When Diaz did not appear

---

[9]   For the reasons stated *supra*, the Court overrules Defendants' objections to the copy of Diaz's "court file" as containing hearsay and lacking in authentication.  (Doc. 105); *see* n. 8.

[10]   Defendants object to Ms. Hernandez's statements about her "impression" as lacking the requisite personal knowledge.  (Doc. 105).  However, the Court is only considering the statements as indication of Ms. Hernandez's state of mind at the time, and does so to reinforce that Plaintiffs have not produced evidence to dispute that Diaz's charges were not resolved.

as required by the NCOA, Palacios issued a capias pro fine for each of the tickets.  (Doc. 90, Ex. 20 at p. 23; Doc. 74, Ex. B; Doc. 75, Ex. L).

**2.      Final Underlying Class C Offense and Arrest**

Apparently in late 2009, the charter school Diaz was attending issued her another ticket for failure to attend school.  (Doc. 90; Doc. 74, Ex. B; Doc. 75, Ex. L; Doc. 90, Ex. 21 at ¶ 3).  In response to a summons related to this ticket, both Diaz and Hernandez appeared at the Municipal Court on February 25, 2010.  (Doc. 74, Ex. B; Doc. 75, Ex. L; Doc. 75, Ex. L at Attachment 1; Doc. 90, Ex. 21 at ¶ 3).  Diaz did not appear before Palacios, who was present in chambers but not "on the bench"; rather, she spoke directly to Palacios's staff.  (Doc. 74, Ex. B; Doc. 75, Ex. L; Doc. 90, Ex. 6 at pp. 63-67; Doc. 90, Ex. 21 at ¶ 3).  The affidavits of Palacios's Court Coordinator, Robert Leal,[11] and staff member, Marcella Cherry, and the evidence attached, reflect that Diaz did not contest the latest charge but indicated to the staff that she needed more time to pay the fine.  (Doc. 74, Ex. B; Doc. 74, Ex. B at Attachment 2; Doc. 75, Ex. L; Doc. 75, Ex. L at Attachment 2).  Cherry states that she informed Diaz that "a payment plan was an acceptable option for satisfying the sentence on a Class C charge for failure to attend school,"

---

[11]  Plaintiffs object to the Court's consideration of Leal's affidavit on the grounds that he lacks personal knowledge to state that "we [Palacios's court] comply with the law and statute in everyway (sic)," and to explain the interaction between Diaz and Palacios's staff on February 25, 2010.  (Doc. 90; *see* Doc. 74, Ex. B); FED. R. CIV. P. 56(c)(4) ("An affidavit…used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  Obviously, any statement by Leal regarding the lawfulness of Palacios's court procedures is a conclusion of law that is entitled to no evidentiary weight.  Further, Leal admitted in his deposition that Diaz "dealt more with Marcella Cherry" and "interacted with Marcella Cherry" regarding the charges on which Diaz had outstanding warrants, and therefore the Court agrees with Plaintiffs that he lacks personal knowledge to state what occurred with regard to the disposition of those charges.  (Doc. 90, Ex. 6 at p. 67).  However, Leal's testimony indicates that he does have personal knowledge of what occurred when Diaz appeared before the staff in response to the summons on the final charge—that is, before the staff discovered the existence of the warrants.  (Doc. 90, Ex. 6 at pp. 63-67).  Further, his statements regarding the disposition of Diaz's final charge are supported by the evidence attached to his affidavit.  (Doc. 74, Ex. B at Attachments 1-3).  Therefore, the Court will consider the statements in Leal's affidavit to the extent that they relate to the disposition of the final charge.

but that only Palacios could approve the alternative sentence. (Doc. 75, Ex. L). Cherry took Diaz's request for an alternative sentence to Palacios, who was in chambers, and Palacios approved it. (Doc. 75, Ex. L; *see also* Doc. 74, Ex. B). Diaz signed an "Explanation/Waiver of Rights and Plea" form acknowledging and waiving her rights and pleading guilty to the offense and Palacios entered a "Judgement and Sentence" requiring payment of the assessed fine and costs of $387.00 by April 25, 2010. (Doc. 74, Ex. B at Attachment 2; Doc. 75, Ex. L at Attachment 2).

Sometime after Palacios had approved the extended time for payment and left the office, her staff discovered that Diaz had three outstanding warrants on her prior tickets for failure to attend. (Doc. 74, Ex. B; Doc. 75, Ex. L; Doc. 90, Ex. 6 at pp. 63-67; Doc. 90, Ex. 21 at ¶ 3). Cherry told Diaz, who was still present, that the fines totaled $1,605.00. (Doc. 75, Ex. L). Cherry indicates in her affidavit that she did not inform Diaz of the option to pay by installment because she believed that Diaz "was already aware of the ability to do a payment plan," but states that she did inform Diaz that she could satisfy the fines by performing over 100 hours of community service or by serving time in jail at a rate of $100 per day. *Id.* Cherry states that because only Palacios could approve an alternative sentence, Cherry attempted to reach Palacios three or four times but was unsuccessful. *Id.* Cherry was therefore unable to release Diaz and told her that she would have to appear before the arraigning judge for sentencing. *Id.* Cherry states that "[b]efore she was taken into custody by a local deputy constable I explained to Ms Diaz and her mother that if the arraigning judge ordered her to serve time for the outstanding warrants and if she didn't think she would be able to pay the fine and costs by April 25th on the newer case, she could go by our office and petition for community service." *Id.* In contrast, Hernandez states that she and Diaz both asked Cherry to allow them to pay the fines for the 2006

and 2008 tickets in installments "or with a bond," but Cherry "insisted that Elizabeth pay the amount in full, or be immediately jailed for the old fines."  (Doc. 90, Ex. 21).[12]

Plaintiffs claim that Diaz, like De Luna, asserted her indigency during the booking process by answering "no" to the question of whether she could afford an attorney on the prescribed from.  (Doc. 90; Doc. 90, Ex. 16).[13]

## 3.    Arraignment

The next day, Diaz was arraigned before Defendant Contreras via videoconference. (Doc. 90, Exs. 17, 22).  Contreras began by admonishing all of the defendants present, including Diaz, regarding their rights to the assistance and appointment of counsel and to remain silent, and then addressed each defendant individually.  (Doc. 90, Ex. 22 at p. 2).  With respect to Diaz, the transcript of the arraignment provides in full as follows:

> Judge:        Elizabeth Diaz?  Elizabeth, *(Spanish)* you have three *([E]nglish)* citations.
> *(Spanish)* um *(English)* for failure to attend school.  *(Spanish)* the fine
> *(English)* is $533, $583, *(Spanish)* and *(English)* $587.  *(Spanish)*  Take a
> seat please.

*Id.* at p. 4.  As the transcript reflects, Diaz did not tell Contreras that she was indigent.  Contreras proceeded to sign three separate Class C commitment orders to jail Diaz for the time necessary to satisfy her fines.  (Doc. 90, Ex. 18).

---

[12]  Defendants object to this portion of Hernandez's affidavit as containing hearsay, but what Cherry told Hernandez is admissible as an admission by a party-opponent.  (Doc. 105); *see* FED. R. CIV. P. 801(d)(2). Defendants also claim that Hernandez lacks personal knowledge to attest to what Cherry told Diaz after Hernandez left the room to avoid seeing Diaz handcuffed, but the Court cannot discern from the record which statements may have been made after that time.  (Doc. 105).  Further, even if inadmissible the Court need not accept Cherry's version of what she told Hernandez and Diaz for the purpose of determining whether summary judgment is appropriate.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (although court should review summary judgment record as a whole, "it must disregard all evidence favorable to the moving party that the jury is not required to believe").
[13]  *See* n. 8.

### 4.    Incarceration and Damages

Hernandez states that neither she nor Diaz had the money to pay the fines, and therefore Diaz remained in jail for 18 days to satisfy her debt.  (Doc. 90, Ex. 21 at ¶ 4).  Plaintiffs claim, without reference to admissible or attached evidence, that Diaz was "un-enrolled" from her charter school while incarcerated.  (Doc. 90).[14]  Hernandez also attests that Diaz missed taking the "TAKS" (Texas Assessment of Knowledge and Skills) test.  (Doc. 90, Ex. 21 at ¶ 5).  Plaintiffs further claim, with reference to the challenged report of Dr. Thorne and portions of Diaz's deposition, that Diaz experienced abuse of a "sexual nature" by her cell mates while she was incarcerated.  (Doc. 90; Doc. 90, Ex. 23; Ex. 28 at pp. 162-65).  Plaintiffs also assert that Diaz continues to suffer from depression and post-traumatic stress disorder ("PTSD") as a result of her incarceration in February 2010, and point to Dr. Thorne's conclusion that the trauma resulting from her detention "has *significantly* impacted her life and functioning."  *Id.* (emphasis in original).  Defendants question Diaz's credibility regarding any claim that she suffered physical harm during her incarceration, pointing to her interrogatory response that she did not. (Doc. 105; Doc. 74, Ex. E at Response to Interrogatory No. 11).  Defendants also object to Dr. Thorne's opinion under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 591 (1993), discussed more fully *infra*.  (Doc. 105).

### 5.    Final Disposition of Fourth Ticket

After her release from jail, on March 22, 2010, Diaz returned to Palacios's office and submitted a written motion stating her inability to pay the fine assessed for her fourth ticket and requesting the alternative sentence of community service.  (Doc. 74, Ex. B; Doc. 74, Ex. B at Attachment 3; Doc. 75, Ex. L; Doc. 75, Ex. L at Attachment 3).  Palacios granted the request by

---

[14]  The Court sustains Defendants' objection that Hernandez's statement about what school officials told her over the phone is inadmissible hearsay.  (Doc. 105; *see* Doc. 90, Ex. 21 at ¶ 5).

ordering Diaz to serve 40 hours of community service by April 9, 2010 in lieu of paying the fine.
*Id.*; *see also* (Doc. 74, Ex. B at Attachment 1; Doc. 75, Ex. L at Attachments 4, 5).   Four days
later, on March 26, 2010, Diaz returned to Palacios's office to request more time to complete her
service hours.  (Doc. 75, Ex. L; Doc. 75, Ex. L at Attachment 5).   Palacios granted the request
and gave Diaz a new completion date of May 10, 2010.  (Doc. 74, Ex. B at Attachment 1; Doc.
75, Ex. L; Doc. 75, Ex. L at Attachments 4, 5).   Diaz completed the hours and the case was
closed on April 19, 2010.  (Doc. 75, Ex. L at Attachment 5).

**C.    Incarceration for Nonpayment of Fines in Hidalgo County**

Defendants object to all evidence concerning how the named Plaintiffs' and other
proposed class members' school tickets were eventually converted into warrants, emphasizing
that this case concerns only whether Defendants provide proper indigency screenings before
incarcerating adults for Class C misdemeanors.  (Doc.  105).   Although Defendants correctly
assess the substance of Plaintiffs' individual and classwide claims, the Court overrules
Defendants' "relevance" objections, finding that this evidence provides necessary context to the
claims.   It is undisputed that while serving as JP, Palacios adjudicated a large number of failure
to attend school and other school-rule citations by local law enforcement.  (Doc. 90, Ex. 6 at pp.
14, 31, 123, 130).   Palacios's Court Coordinator Leal testified that if a student and his or her
parent signed the "Explanation and Waiver of Rights" form after meeting with Palacios's staff,
and then appeared before Palacios and pleaded guilty, Palacios imposed a set fine for the offense
but simultaneously "suspended" or "waived" the fine pending the student's completion of the
terms of deferred adjudication that Palacios found appropriate for each individual case.  *Id.* at pp.
25-26, 38-40, 44, 82-83, 154-58, 167.   If Palacios's court determined that the student had not
completed the terms by his or her 17th birthday, the staff mailed to the student's last-known

address the "Notice of Continuing Obligation to Appear" on a specified date to answer to the outstanding charges. *Id.* at pp. 88-90, 127-28. If the student failed to appear in response to the NCOA, Palacios issued a capias pro fine authorizing the student's incarceration. *Id.* at pp. 56-59, 88, 91. Once issued, the capias pro fine remained in the County system so that if the student, now an adult, were eventually charged with another offense, the Sheriff's Office would have notice of the warrant. *Id.* at p. 61. County Sheriff Guadalupe Trevino testified that the Sheriff's Office considers a capias pro fine issued from a JP to be "an order from the magistrate…to take [the defendant] into custody and deliver her to our county jail until she either pays the fine or the warrant is recalled…." (Doc. 90, Ex. 9 at p. 22). Upon arrest, the defendant is booked into the County Jail and arraignment occurs there within 48 hours. (Doc. 90, Ex. 3 at pp. 26-27; Ex. 9 at p. 52). Although Leal testified that Palacios told students and parents at their JP court appearances that she would consider their inability to pay the assessed fines, he also indicated that it was incumbent upon the student or parent to directly inform Palacios or her staff that they were unable to pay. (Doc. 90, Ex. 6 at pp. 40-41, 68, 164-65). No affirmative inquiry into indigence occurred before the issuance of the capias pro fine or before booking, either on the part of Palacios or the Sheriff's Office. *Id.* at pp. 68, 117-18.

As explained *infra*, Plaintiffs take the position that the requirements of Texas Code of Criminal Procedure Article 45.046 mirror what due process and equal protection require—that is, that Defendants conduct an affirmative indigence screening before incarcerating any person charged with a Class C misdemeanor, fine-only offense. (Doc. 90). Defendants admit and the record establishes that they do not provide this in every case; rather, they contend that the burden falls upon the defendant to affirmatively raise his or her inability to pay. (Docs. 74, 105; Doc. 90, Exs. 4, 7). The parties dispute what constitutes "raising" indigency, with Plaintiffs pointing

to the Sheriff's Office booking form on which a defendant states that he or she cannot afford an attorney as sufficient to alert Defendants to that person's inability to pay a fine, and with Defendants essentially arguing that the defendant must contact the office of the JP from whom the charges arose to make alternate sentencing arrangements, and/or voice his or her inability to pay the fine at arraignment.  (Docs. 74, 90, 105).  All of the relevant deposition testimony indicates that the "Hidalgo County Sheriff's Office Questions Regarding Attorney Information" to which Plaintiffs appeal is completed by a Sheriff's Office employee during the booking process, and no evidence exists that any interaction occurs between the Sheriff's Office and the arraigning Magistrate concerning the content of this form.  (Doc. 90, Ex. 3 at pp. 53-55; Ex. 6 at pp. 107-08; Ex. 9 at pp. 46-50).  Instead, the information contained within the form is either communicated by the Sheriff's Office to the "indigent defense" office, or those defendants who request appointed counsel at arraignment "stay and talk to the indigent defense department…." (Doc. 90, Ex. 3 at p. 54-55; Ex. 6 at p. 93-97; Ex. 9 at p. 59).  The indigent defense office is not under the jurisdiction the Sheriff's Office, but has an office space located next to the "magistration room" where arraignments occur.  (Doc. 90, Ex. 3 at pp. 39-40; Ex. 6 at p. 97; Ex. 9 at pp. 48, 59).

County employee Bertha Garza, who testified to her knowledge of the booking process and who worked as an arraignment officer, indicated that arraignment is the only means through which a Class C defendant, once arrested, can be discharged.  (Doc. 90, Ex. 3 at pp. 21-22, 27, 33-34, 45).[15]  After arrest and during booking, Sheriff's Office personnel calculate the

---

[15]  Defendants object to Plaintiffs' use of Garza's deposition testimony, contending that Garza was only produced as a designated representative "to discuss the rotating magistrate system in Hidalgo County" and has no personal knowledge to testify as to the JPs/Magistrates' procedures regarding Class C offenses and indigency screenings.  (Doc. 105).  The Court finds upon review of the entirety of Garza's deposition that she has the requisite personal knowledge to make those statements referenced by the Court in its Order and overrules Defendants' objections.

defendant's release date based on the amount of the fine at a rate of $100 per day.  (Doc. 90, Ex. 3 at p. 42-44; Ex. 9 at pp. 64-65).  Leal testified that during the Class C arraignments at which Palacios presided,

> she would not ask if they were indigent or if they had money to pay or not, she notified them why they're there, there's a fine amount that would be paid, and if they couldn't pay it, that they would be granted time served.  We usually relied on them to let us know.  The same way in…our court proceedings for truancy, we would rely on pretty much the same procedure.  If you don't tell me you're not able to pay, I can't know that.

(Doc. 90, Ex. 6 at p. 54).  Leal further stated that if a defendant claimed indigency, "then we would take out the proper forms and take it before the judge [to] get the judge's approval [of an alternative sentence]."  *Id.* at p. 55.  Garza, who witnessed arraignments, indicated that the few defendants who told the Magistrates that they were unable to pay their fines and opted not to do jail time were referred to the JP who issued their warrants for the purpose of making alternative sentencing arrangements.  (Doc. 90, Ex. 3 at pp. 27-29, 70-73).  When asked if she had "ever seen a defendant say that they cannot pay or cannot afford a fine and then see the judge send them to jail anyway," Garza responded, "No."  *Id.* at pp. 70-71.  However, Garza had no knowledge of how or whether those defendants made alternate arrangements and were released.  *Id.* at p. 73-74.

Defendants argue that it is the routine practice of all of the JPs/Magistrates to assume that those defendants who "raise" indigency within Defendants' definition are in fact indigent, and to offer sentencing options.  (Docs. 74, 105).  The evidence on which Defendants rely consists of a sampling of files taken from the nine JP courts showing that defendants charged with Class C misdemeanors received community service or some other means of satisfying their fines, both before and after the filing of Plaintiffs' action.  (Doc. 74, Ex. M).  Other examples include various individuals who appear on a list of persons arraigned and incarcerated for Class C

offenses from January 2009 through March 2010, and who Plaintiffs argue are potential class members.  (Doc. 90, Ex. 2).[16]  One of them, Arnulfo Ramirez Garza, was arraigned with De Luna.  (Doc. 90, Ex. 2 at p. 35; Doc. 90, Ex. 10).  After De Luna pleaded guilty, Garza indicated to Magistrate Trevino that he wanted to make payment arrangements to satisfy the $357 fine assessed by Palacios.  (Doc. 90, Ex. 10 at pp. 11-13).  Trevino responded that Palacios would be notified and Garza was released that day.  (Doc. 90, Ex. 2 at p. 35; Doc. 90, Ex. 10 at p. 13).  Another Class C defendant who appears on the list, Lee Roy Trevino, attested that he could not pay the fines assessed against him and was offered a community service option but decided to serve jail time instead.  (Doc. 90, Ex. 2 at p. 20; Doc. 90, Ex. J).  Defendants point to other Class C defendants on the list who had multiple charges and were released soon after arraignment, apparently asking the Court to assume that they secured their release by expressing their inability to pay and accepting alternative sentencing.  (Doc. 105).  Defendants also have offered the virtually identical affidavits of seven of the JPs/Magistrates named as parties to this suit, excluding Palacios and Espinosa, stating that "I am aware of my obligation under the law to screen persons who tell me that they are indigent to determine if they are in fact indigent, and if so to offer a sentence alternative other than incarceration for a fine only offense."  (Doc. 105, Ex. C).  Each Defendant further attests,

> I have never incarcerated a defendant for a fine on a Class C misdemeanor that raised his or her indigency as reason for not paying…. Alternative sentencing is always allowed for anyone who wishes to opt for a sentence that does not involve paying the fine.  All any defendant need do is indicate they cannot or do not want to pay the fine.

*Id.*  Defendants offer the supplemental affidavit of Leal to attest to Palacios's adherence to the practice described in the other Defendants' affidavits.  *Id.*  It is undisputed that any Class C defendant who fails to request and then choose alternative sentencing is incarcerated in the

---

[16]  Defendants object to Plaintiffs' characterization of this exhibit but not to its admissibility.  (Doc. 105).

County Jail until the fines are satisfied at a rate of $100 per day, pursuant to the authority of a Class C commitment order signed by the Magistrate and executed by the Sheriff's Office.  (Doc. 90, Exs. 4, 7; Ex. 9 at pp. 63-64).  Sheriff Trevino testified that he had "no idea" whether community service was an option for defendants jailed for nonpayment of fines, and that based on his personal experience, "if a person cannot pay a fine and it is a Class C misdemeanor,…and they have already been convicted and assessed that fine, then they will spend a specific time in jail to pay off the fine in lieu of the fine."  (Doc. 90, Ex. 9 at pp. 74-75).

**III.    Plaintiffs' Individual and Class-Wide § 1983 Claims**

**A.    Claims for Declaratory and Injunctive Relief**

Again, Plaintiffs on their own behalf and on behalf of the proposed class invoke § 1983 to seek declaratory relief against the Magistrates in their official capacities and declaratory and injunctive relief against the County for the federal due process and equal protection violations alleged.  Although these claims initially survived Defendants' motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court's reexamination of the claims in the context of the instant Motions brought to light an issue not previously addressed by the parties—that is, whether the named Plaintiffs have standing to bring claims for declaratory or injunctive relief, either individually or in a representative capacity.  More specifically, the Court finds it necessary to consider whether Plaintiffs face the kind of "real and immediate threat" necessary to confer standing.  *See Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003) (court may consider issue of standing *sua sponte*).  As such, the Court ordered supplemental briefing on this issue, which the parties have provided.  (Docs. 107, 109-112).

"It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an

actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). "To demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Bauer*, 341 F.3d at 358 (citing *Lyons*, *supra*).  The plaintiff must allege facts from which a "substantial and continuing controversy" between two adverse parties may be reasonably inferred. *Id.*  "[T]he continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." *Id.*  "'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief…if unaccompanied by any continuing, present adverse effects.'" *Id.* (quoting *Lyons*, 461 U.S. 95 (1983)).  "To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future." *Id.*  "Similar reasoning has been applied to suits for declaratory judgments." *Id.* (citing *Ashcroft v. Mattis*, 431 U.S. 171 (1977); *Golden v. Zwickler*, 394 U.S. 103 (1969)).  If a named Plaintiff fails to establish standing, "he or she may not seek relief on behalf of himself or herself or any other member of [a] class." *James v. City of Dallas*, 254 F.3d 551, 563 (5th Cir. 2001) (citing *O'Shea v. Littleton*, 414 U.S. 488 (1974)).

To demonstrate their standing to obtain an order declaring as unconstitutional and enjoining Defendants' challenged practices, Plaintiffs must show that they face a "real and immediate" threat that while indigent, they will again be charged with a Class C, fine-only offense and then arrested and incarcerated solely because they are unable to pay the fine, and without being afforded the affirmative indigency screening they allege is constitutionally required.  Each Plaintiff offers a virtually identical affidavit stating that "I affirm that I was

indigent during the events at issue in this case and remain indigent to this day.  In…2010 I was jailed for failure to pay fines assessed in connection with multiple Class C misdemeanor charges without Defendants having provided any determination as to my ability to pay.  Additionally, despite my indigence, I was not provided any alternatives for payment prior to being incarcerated."  (Doc. 110, Ex. 1 at ¶ 3; Doc. 112, Ex. 1 at ¶ 3).  De Luna further states that "I do not currently work and dropped out of high school.  My job prospects are very bad right now."  (Doc. 112, Ex. 1 at ¶ 4).  Diaz simply states, "I do not work or go to school."  (Doc. 110, Ex. 1 at ¶ 4).  Although Defendants take issue with Plaintiffs' dim predictions of their economic futures, even assuming that Plaintiffs are likely to be indigent for the foreseeable future, they must still show a real and immediate threat that they will again be charged with a Class C misdemeanor. Plaintiffs first argue that they can make this showing because "they each have faced multiple such charges in the past."  (Doc. 110).  Again, De Luna faced 25 Class C charges, and Diaz faced three, when they were arrested, arraigned, and incarcerated for their failure to pay fines assessed for those charges.  *Id.*  What Plaintiffs overlook, and Defendants point out, is that all but one of the 28 charges were for school-related tickets.  (Doc. 109).  As described in detail above, the manner in which those tickets were adjudicated in the JP and juvenile courts, leading to the issuance of the NCOAs and ensuing capiases pro fine, resulted in each Plaintiff becoming subject to arrest for failure to pay accumulated fines on multiple offenses.  By the time suit was filed, Plaintiffs no longer faced the threat of tickets for school-rule violations, nor does the record indicate that any ticketed offenses remain unadjudicated.  Defendants characterize Plaintiffs' entire lawsuit as a circuitous attempt to target Palacios's actions in adjudicating the school-related tickets, and therefore argue that Plaintiffs cannot show standing because they face no possibility of similar injury by Palacios in the future, especially since she has been suspended

from office.  (Doc. 109; Doc. 109, Ex. A); *see, e.g.*, *Bauer*, 341 F.3d at 358 ("This court has often held that plaintiffs lack standing to seek prospective relief against judges where the likelihood of future encounters is speculative.").  The Court agrees that Plaintiffs will never be arrested on the authority of capiases pro fine issued for their failure to appear in response to NCOAs to answer to juvenile conduct, which makes highly unlikely that they will ever find themselves facing the level of fines that led to their incarcerations in 2010.

Nonetheless, Plaintiffs cite to various state code and city ordinance provisions and U.S. Department of Justice ("DOJ") statistics to argue that Class C misdemeanor charges in the area where Plaintiffs live include such common offenses, and that individuals in the United States and especially Hispanics and young adults were so frequently stopped and ticketed for traffic offenses in 2008, that Plaintiffs "certainly face a 'real and immediate threat' of finding themselves charged with Class C misdemeanors within which traffic tickets constitute merely one of a myriad of categories."  (Doc. 110).  The Court finds these arguments unpersuasive. First, that the authority exists to charge an individual residing in Edinburg for conduct classified as a Class C misdemeanor by state or local law does not in itself demonstrate a substantial likelihood that local law enforcement will in fact charge Plaintiffs with these offenses in the near future.  Further, the DOJ report to which Plaintiffs cite contains nationwide statistics on traffic stops in a given year that cannot be extrapolated to one particular county in a manner sufficient to persuade that Plaintiffs themselves are soon likely to be stopped and ticketed.  Notably, Plaintiffs cite to no case, and the Court has located none, in which standing was conferred based on the threat of a future criminal charge or arrest.  In fact, the Supreme Court has held the opposite.  The Court in *O'Shea*, *supra*, explained that "it seems to us that attempting to anticipate whether and when [the plaintiffs] will be charged with a crime and will be made to appear before

[the defendant magistrate or circuit court judge] takes us into the area of speculation and conjecture," and concluded that the plaintiffs lacked standing to enjoin the defendants' alleged discriminatory bond-setting, sentencing, and jury-fee practices, either on their own behalf or on behalf of a class. *O'Shea*, 414 U.S. at 676-77.  Relying in part on *O'Shea*, the Supreme Court in *Lyons*, *supra*, found that the plaintiff had no standing to obtain injunctive relief against the use of chokeholds by City of Los Angeles police officers.  *Lyons*, 461 U.S. at 101-10.  The Court reasoned: "[t]hat Lyons may have been illegally choked by the police…, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part."  *Id.* at 105. Plaintiffs claim that the Supreme Court "did not quarrel" with the Ninth Circuit's "suggestion" in the decision under review that "the chances of being stopped by a policeman for an alleged motor vehicle violation are fairly good" and therefore meet the requirements of a case or controversy.  (Doc. 110); *Lyons v. City of Los Angeles*, 615 F.2d 1243, 1246-47 (9th Cir. 1980). However, the Court does not read the Supreme Court's reversal of that decision as implicitly recognizing that the likelihood of a future traffic stop can confer standing; the Supreme Court merely stated that "*even assuming* that Lyons would again be stopped for a traffic or other violation in the reasonably near future, it is untenable to assert…that strangleholds are applied by the Los Angeles police to every citizen who is stopped or arrested regardless of the conduct of the person stopped."  *Lyons*, 461 U.S. at 108 (emphasis added).  Similarly, the Court cannot find a substantial likelihood that Plaintiffs will be stopped and then ticketed for a traffic violation (or any other Class C violation), and that the conduct underlying the charge will be such that the fine

will exceed the amount either Plaintiff is able to pay.  Admittedly, the County-wide practice that Plaintiffs challenge as unconstitutional is more certain in its application than the alleged chokehold policy in *Lyons*; regardless of the merits of that challenge, Defendants concede that they do not provide an indigency determination to every person charged with a Class C, fine-only misdemeanor.  But Plaintiffs' showing that they will again be incarcerated pursuant to this alleged policy depends on so many contingencies, most of which are speculative to varying degrees, that the Court cannot find that Plaintiffs have the requisite standing to obtain the equitable relief they seek, either on their own behalf or on behalf of the proposed class. Therefore, class certification must be denied and the named Plaintiffs' claims against the Magistrates and all but their damages claim against the County must be dismissed.  This does not mean, as the Supreme Court recognized, that "'federal law will exercise no deterrent effect in these circumstances'"; for one, the legality of the practices Plaintiffs allege to be unconstitutional can be determined in their action for damages under § 1983.  *Lyons*, 461 U.S. at 112-13 (quoting *O'Shea*, 414 U.S. at 503).

**B.    Claim for Damages**

**1.    Summary Judgment Standard of Review**

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit under the governing law, and a fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the record, if any, which

it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a), (c). Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324; FED. R. CIV. P. 56(c), (e). In conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006). However, the nonmovant cannot satisfy its burden with "conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

## 2.  Liability under § 1983

On their own behalf only, Plaintiffs seek damages from the County for incarcerating them for their failure to pay fines for Class C misdemeanors without affording them an affirmative indigency determination. To prevail on their § 1983 claim for damages, Plaintiffs must show that (1) the offending conduct was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of rights secured by the Constitution. *Bauer*, 341 F.3d at 357. The County is a "person" who may be sued under § 1983, but not because it employs a tortfeasor—that is, it cannot be held liable on a *respondeat superior* theory. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). Rather, to establish that the

County acted under color of state law, Plaintiffs must show that it adopted an official policy that is the moving force behind the claimed constitutional violations. *See*, *e.g.*, *Duvall v. Dallas Cnty.*, 631 F.3d 203, 209 (5th Cir. 2011) (citing *Monell*, 436 U.S. at 694).

**3.       Official Policy**

Defendants' Motion for Summary Judgment first disputes that the requisite official policy exists in the present case. (Doc. 74). The Fifth Circuit has defined "official policy" as follows:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). Plaintiffs assert that the County's challenged practice falls under the second definition—that is, that the County has a custom of "jailing indigent individuals for their inability to pay outstanding fines without conducting indigency determinations." (Doc. 90). Although acknowledging in their first-filed Motion that "Plaintiffs will inevitably argue that…the practice of ignoring the right to an indigency screening and alternative sentencing was so widespread that it constituted a custom," Defendants argue that Plaintiffs can only show the existence of a custom by proving that it was adopted through "deliberate indifference." (Doc. 74). They do so by relying on a single case from outside this Circuit, but more applicable Fifth Circuit precedent directs that the custom itself must be unconstitutional or, if not, "must have been adopted 'with deliberate indifference to the known or obvious fact that…constitutional violations would result.'" *James v. Harris Cnty.*, 577 F.3d 612,

617 (5th Cir. 2009) (quoting *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004)).  "Unlike the deliberate indifference standard applied to individual employees, this standard is an objective one; it considers not only what the policymaker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights."  *Lawson v. Dallas Cnty.*, 286 F.3d 257, 264 (5th Cir. 2002).  In sum, the Court must conduct the deliberate indifference inquiry if it concludes that the County had a facially harmless policy that is nonetheless linked to a constitutional violation.  *See id.* at 263 (citing *Monell*, 436 U.S. at 690-94).

No party disputes, and "[i]t has long been recognized that, in Texas, the county sheriff is the county's final policy maker in the area of law enforcement…."  *Turner v. Upton County*, 915 F.2d 133, 136 (5th Cir.1990) (citing *Briscoe*, 619 F.2d at 404).  Sheriff Trevino in fact confirmed in his deposition testimony that "as sheriff I am in charge of everything that occurs in [the County Jail]," including "[p]olicy creation, the execution, [and] the implementation."  (Doc. 90, Ex. 9 at p. 31).  As set forth in detail above, the Sheriff also testified that the Sheriff's Office considers a capias pro fine issued from a JP to be an order to take the defendant into custody until he or she pays the fine or the warrant is recalled.  Thus, upon arrest, the defendant is booked into the County Jail to await arraignment.  If the arraigning Magistrate issues a Class C commitment order, the defendant is jailed until he or she has served the amount of time necessary to pay the fine as calculated by the Sheriff's Office.  Although the Sheriff's Office uses a form during the booking process to record a defendant's response to the question of whether he or she can afford an attorney, it does not inquire into whether the defendant can pay the fines assessed.  Rather, it simply calculates the amount of time the defendant must serve in jail to satisfy the fines.  Further, the Court finds undisputed that the JPs/Magistrates, before

issuing a capias pro fine or a Class C commitment order, do not consider whether the defendant can pay the fines or whether the defendant has made a good faith effort to satisfy them, or offer alternative sentencing, unless the defendant directly raises his or her inability to pay with the JP and/or arraigning Magistrate.  Therefore, if the defendant does not request and then choose alternative sentencing, the County jails the defendant pursuant to the authority of the Magistrate's order.  Based on the above, the Court finds no genuine dispute regarding the common and well-settled custom in place: the County jails individuals charged with Class C, fine-only offenses who have failed to directly inform the JP and/or arraigning Magistrate of their inability to pay the assessed fines.  In fact, Defendants admit that this custom exists and spend most of their efforts arguing that it does not violate the Constitution, a question that the Court will now consider.  (Doc. 90, Exs. 4, 7; Docs. 74, 105).

**4.    Constitutional Deprivation**

Although, as discussed *infra*, Defendants claim that a proper indigency determination was in fact made in Diaz's case and that both Plaintiffs chose to go to jail, the parties' principal dispute in this case is whether the County must affirmatively determine indigency in every case or only when a defendant affirmatively "raises" his or her own inability to pay.  Plaintiffs effectively equate the requirements of Article 45.046 with those of due process and equal protection, appealing to the U.S. Supreme Court's decision in *Williams v. Illinois*, 399 U.S. 235 (1970), and its progeny.  (Doc. 90).  Pointing to two Fifth Circuit cases that interpret this authority, Defendants respond that a defendant must first raise his inability to pay, and be denied the opportunity to serve an alternate sentence, for any constitutional violation to exist.  (Doc. 74). In order to resolve the parties' dispute, the Court must consider in detail each of the cases on which the parties rely and their relation to the provisions of Article 45.046.

In *Williams*, the Supreme Court confronted the "narrow issue" of "whether an indigent may be continued in confinement beyond the maximum term specified by statute because of his failure to satisfy the monetary provisions of the sentence." *Williams*, 399 U.S. at 236.  Williams was convicted of petty theft and received the maximum sentence under Illinois law, consisting of one year of imprisonment and a $500 fine.  *Id.*  He was also taxed $5 in court costs.  *Id.*  The judgment directed, as permitted by statute, that if the petitioner was in default of the payment of the fine at the expiration of the one-year sentence, he should remain in jail to "work off" the monetary obligations at the rate of $5 per day.  *Id.*  While still an inmate in the county jail, Williams petitioned the sentencing judge to vacate that portion of the order requiring that he remain imprisoned for nonpayment of the fines and costs, contending that he was indigent at all stages of the proceedings, could not satisfy the money portion of the sentence, and upon release would be able to earn the funds to make payment.  *Id.* at 237.  On appeal of the dismissal of his petition, the Supreme Court observed that default imprisonment for failure to pay fines "has traditionally been justified on the ground it is a coercive device to ensure obedience to the judgment of the court" and "may always be avoided by payment of the fine." *Id.* at 240.  The Court found that this was "an illusory choice for Williams or any indigent," and therefore "the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum." *Id.* at 242.  The Court concluded:

> We have no occasion to reach the question whether a State is precluded in any other circumstances from holding an indigent accountable for a fine by use of a penal sanction. We hold only that the Equal Protection Clause of the Fourteenth Amendment requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their economic status.

> The State is not powerless to enforce judgments against those financially unable to pay a fine; indeed, a different result would amount to inverse discrimination since it would enable an indigent to avoid both the fine and imprisonment for nonpayment whereas other defendants must always suffer one or the other conviction.

> It is unnecessary for us to canvass the numerous alternatives to which the State [by] legislative enactment—or judges within the scope of their authority—may resort in order to avoid imprisoning an indigent beyond the statutory maximum for involuntary nonpayment of a fine or court costs…. The State is free to choose from among the variety of solutions already proposed and, of course, it may devise new ones.

*Id.* at 244-45.[17]  The Court noted Williams's proposal that payment be collected in installments, which was a solution utilized in some states, as well as his suggestion that the trial judge require indigents "to do specified work during the day to satisfy the fine." *Id.* n.21.

The Supreme Court in *Tate v. Short*, 401 U.S. 395 (1971), went beyond the narrow question presented in *Williams* to consider whether imprisonment of indigents for offenses punishable by fine only implicated equal protection.  After accumulating fines of $425 on nine convictions for traffic offenses, Tate was committed to a municipal prison farm pursuant to the authority of the Texas Code of Criminal Procedure and a city ordinance requiring that he remain there to satisfy the fines at the rate of $5 per day.  *Tate*, 401 U.S. at 396-97.  After 21 days in custody, Tate was released on bond when he applied to the county criminal court for a writ of habeas corpus alleging that he was too poor to pay the accumulated fines.  *Id.* at 397.  The State stipulated to Tate's indigency at the habeas hearing but the court denied the application and the Texas Court of Criminal Appeals affirmed, stating that it was overruling Tate's objection that his imprisonment was unconstitutional because he was too poor to pay the fines.  *Id.* n.1.  Relying principally on its decision in *Williams*, the Supreme Court held that Tate's imprisonment for nonpayment "constitutes precisely the same unconstitutional discrimination since, like Williams, [Tate] was subject to imprisonment solely because of his indigency."  *Id.* at 397-98.  The Court adopted the view previously espoused by four members of the Court that "'the same

---

[17]  The Court noted that the purpose of incarceration for failure to pay court costs appeared to be the same, and that imprisoning an indigent beyond the maximum statutory term for failure to pay court costs also violates equal protection. *Williams*, 399 U.S. at 244 n.20.

constitutional defect condemned in *Williams* also inheres in jailing an indigent for failing to make immediate payment of any fine….  In each case, the Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.'"  *Id.* at 398 (quoting *Morris v. Schoonfield*, 399 U.S. 508 (1970)).  Consistent with its observation in *Williams*, the Court noted that "[t]here are, however, other alternatives to which the State may constitutionally resort to serve its concededly valid interest in enforcing payment of fines."  *Id.* at 399.  The Court stated in conclusion:

> We emphasize that our holding today does not suggest any constitutional infirmity in imprisonment of a defendant with the means to pay a fine who refuses or neglects to do so.  Nor is our decision to be understood as precluding imprisonment as an enforcement method when alternative means are unsuccessful despite the defendant's reasonable efforts to satisfy the fines by those means; the determination of the constitutionality of imprisonment in that circumstance must await the presentation of a concrete case.

*Id.* at 400-01.  On remand to the Texas Court of Criminal Appeals, that court noted that "[i]t now appears that the Legislature has provided 'alternative means' for collection of fines and costs from defendants" through its revisions of the Texas Code of Criminal Procedure, including the article now renumbered as Article 45.046.  *See Ex parte Tate*, 471 S.W.2d 404, 406 (Tex. Crim. App. 1971); *see also* (Doc. 76, Ex. N at p. 19).  That article, which is central to Plaintiffs' claims in this suit, provides in relevant part as follows:

> (a) When a judgment and sentence have been entered against a defendant and the defendant defaults in the discharge of the judgment, the judge may order the defendant confined in jail until discharged by law if the judge at a hearing makes a written determination that:
>
> (1) the defendant is not indigent and has failed to make a good faith effort to discharge the fine and costs; or
>
> (2) the defendant is indigent and:

(A) has failed to make a good faith effort to discharge the fines and costs under Article 45.049 [authorizing community service in satisfaction of fines or costs]; and

(B) could have discharged the fines and costs under Article 45.049 without experiencing any undue hardship.

….

TEX. CODE CRIM. P. Art. 45.046. Although Defendants complain that Plaintiffs are attempting to conflate Article 45.046 and the requirements of due process and equal protection, it is clear that this provision was a response to the Supreme Court's decision in *Tate*.  Further, it tracks the constitutional requirements enunciated in *Bearden v. Georgia*, 461 U.S. 660 (1983), in which the Supreme Court revisited *Williams* and *Tate* when considering "whether the Fourteenth Amendment prohibits a State from revoking an indigent defendant's probation for failure to pay a fine and restitution."  *Bearden*, 461 U.S. at 661.  As a condition of Bearden's sentence of probation for felony burglary and theft charges to which he pled guilty, the trial court ordered him to pay a $500 fine and $250 in restitution in installments.  *Id.* at 662.  After making the first two payments and shortly before the balance came due, Bearden notified the probation office that he was going to be late with his payment because he could not find a job.  *Id.* at 662-63.  After an evidentiary hearing, the trial court revoked Bearden's probation for failure to pay the fine and restitution and sentenced him to serve the remaining portion of the probationary period in jail.  *Id.* at 663.  On appeal of the denial of his claim that his imprisonment violated the Equal Protection Clause of the Fourteenth Amendment, the Court first noted its holdings in *Williams* and *Tate* as well as cases it which it had recognized limits on the protections afforded to indigents and explained that "[d]ue process and equal protection principles converge in the Court's analysis in these cases."  *Id.* at pp. 664-65.  The Court concluded as follows:

We hold, therefore, that in revocation proceedings for failure to pay a fine or restitution, a sentencing court must inquire into the reasons for the failure to pay. If the probationer

willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority.  If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternate measures of punishment other than imprisonment. Only if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay. To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine. Such a deprivation would be contrary to the fundamental fairness required by the Fourteenth Amendment.

*Id.* at 672-73.  Specific to the case before it, the Court determined that "[b]y sentencing [Bearden] to imprisonment simply because he could not pay the fine, without considering the reasons for the inability to pay or the propriety of reducing the fine or extending the time for payments or making alternative orders, the court automatically [and thus unconstitutionally] turned a fine into a prison sentence."  *Id.* at 674.

Plaintiffs construe the above authority as requiring an affirmative determination of indigency, good faith effort to pay, and alternatives to incarceration in each case in which a defendant faces jail time for failure to pay fines, and for obvious reasons: the Supreme Court spoke of the constitutional infirmity inherent in "automatically" turning a fine into jail time "solely" because a defendant cannot pay.  Perhaps most notably, in *Bearden* the Court stated that the sentencing court "*must* inquire" into a defendant's reasons for nonpayment and, if the defendant cannot pay despite sufficient good faith efforts to do so, the court "*must* consider alternate measures of punishment."  Only if these alternate measures are inadequate may the court then incarcerate the defendant without intruding upon fundamental fairness.  Defendants point out that each petitioner in the relevant line of Supreme Court cases "raised" his inability to pay: Williams through a petition to the sentencing judge while he was incarcerated, Tate through a writ of habeas corpus after spending time in custody, and Bearden at a probation revocation hearing.  (Doc. 105).  Therefore, Defendants argue, these cases support the position that the

burden is on the defendant to tell the court that he is indigent. *Id.* However, whether or not the petitioners in these cases raised their indigency with the sentencing courts would have had no effect on the determination of their sentences, as the courts did not consider indigency as a bar to automatic jail time for nonpayment. Because each of these petitioners challenged the failure to consider indigency in determining a proper sentence, Supreme Court authority now exists to safeguard the rights of indigents facing incarceration for nonpayment of fines. In any event, as there is no precise language in these cases stating that a petitioner has or does not have the burden to tell the sentencing court that he cannot pay a fine before the court inquires into indigency, Defendants argue that the Court should look to more applicable Fifth Circuit precedent for guidance. (Docs. 74, 105). The first case to which Defendants cite is *Garcia v. Abilene*, 890 F.2d 773 (5th Cir. 1989), in which Garcia filed suit under § 1983 against the City of Abilene, Texas and its municipal court judge alleging that the city's fine collection system was unconstitutional as applied to her. The city issued a citation to Garcia for failure to restrain her dog, and over the course of the next several months Garcia continuously failed to appear before the court to respond to this and additional failure to appear citations. *Garcia*, 890 F.2d at 774-75. Eventually, after Garcia did not appear to explain her default in the payment of an assessed fine and costs totaling $102, which the court had allowed her to pay in installments, a warrant for her arrest was issued. *Id.* at 775. Garcia was never arrested or incarcerated, but filed suit alleging that the city through the judge unconstitutionally discriminated against her based on her economic status by attempting to imprison her for failure to pay the fine. *Id.* On appeal of the trial court's directed verdict in favor of the city, and upon consideration of *Tate* and *Bearden*, the Fifth Circuit affirmed. *Id.* at 775-76. In doing so, as Defendants emphasize, the Court observed that "[*Tate* and *Bearden*] rest on the assumption that the indigent appears before the court to

assert his inability to pay.  Even assuming an individual is too poor to pay, if he does not appear and assert his indigency, the court cannot inquire into his reasons for not paying and offer alternatives." *Id.* at 776.  Although in isolation this language may appear to support Defendants' position, the Fifth Circuit's observation is unremarkable; it is obvious that if a person never appears in court, the court has no occasion to inquire into indigency.  Thus, the Court does not read *Garcia* to mean that once a defendant *has* appeared before the court, the defendant must affirmatively raise his or her inability to pay before the court has any obligation to consider indigency in determining an appropriate sentence.

Defendants also appeal to the Fifth Circuit's unpublished opinion in *Sorrells v. Warner*, 21 F.3d 1109, 1994 WL 171697 (5th Cir. Apr. 28, 1994), involving a § 1983 action filed against Hayes County, Texas and its county judge and constable in which the plaintiff Sorrells alleged that he was illegally arrested and detained for his failure to pay outstanding fines resulting from his conviction for the offenses of speeding and failure to appear.  After the trial judge issued two capiases for Sorrells's arrest due to his failure to pay the fines, Sorrells was advised of the warrants but actively avoided arrest, instead communicating with the county judge in writing. *Sorrells*, 1994 WL 171697 at *1.  Notably, he advised the judge that he would pay the total amount due when notified of that amount, but upon notification filed a motion to quash the capiases based on legal defects in the documents. *Id.* at *1, *3 n.8.  He was eventually arrested pursuant to the instructions of the county judge and subsequently filed charges of avoiding and resisting arrest. *Id.* at *1.  Citing to the court's observation in *Garcia* that "*Tate* is based on the assumption that the defendant has appeared before the court and asserted his indigency," the court determined that Sorrells's arrest was not unlawful because he did not advise county officials of his indigence and merely contested the legal validity of the capiases. *Id.* at *3 (citing

*Garcia*, 890 F.2d at 776). *Sorrells* lends some support to Defendants' position, as the court was concerned with Sorrells's failure to tell anyone that he was indigent. However, the court's opinion gives some indication that its concern was further legitimized by the fact that Sorrells had represented to the county judge that he would pay the total amount due. *See id.* at *3 n.8. Further, noticeably absent from this decision is any consideration of *Bearden*, which contains the Supreme Court's most explicit language concerning the obligations of a sentencing court to inquire into indigency before ordering a defendant jailed for nonpayment. *Sorrells* does not persuade the Court that the defendant must raise indigency in order to trigger those obligations.

As Plaintiffs observe, at least one district court has refrained from interpreting Supreme Court and Fifth Circuit precedent in the manner urged by Defendants. In *Doe v. Angelina County*, 733 F.Supp. 245 (E.D.Tex. 1990), the plaintiff sued Angelina County, Texas and its sheriff under § 1983 on the grounds that his incarceration in the county jail for failure to pay assessed fines violated his federal due process and equal protection rights. The plaintiff was arrested for the misdemeanor offense of hunting without a license, pled guilty before the justice of the peace, and was taken to the county to jail "to make a bond or pay, or…stay." *Doe*, 733 F.Supp. at 248-49. While the plaintiff was being processed at the jail, officials discovered an outstanding capias warrant for his arrest for failure to pay a $268 fine assessed as a result of a prior conviction. *Id.* at 249. When the plaintiff could not pay that fine, county officials made the determination to jail him immediately for the period necessary to "lay out" the fine. *Id.* at 255. The plaintiff was not taken before a magistrate, no factual determination was made concerning the reasons for his failure to pay the fine, and no consideration was given to alternatives to incarceration. *Id.* Noting the language in *Bearden* that "'[d]ue process and equal protection principles converge'" in Supreme Court cases relating to the treatment of criminal defendants

sentenced to monetary sanctions, the district court explained that *Bearden* "assumes that the principles grounding [those prior holdings] require some form of a pre-deprivation procedure for determining the reasons a party has failed to pay a fine or restitution."  *Id.* at 253 (quoting *Bearden*, 461 U.S. at 665).  The court also described the Fifth Circuit's observation in *Garcia*— that a court cannot inquire into a defendant's reasons for not paying and offer alternatives if the defendant does not appear—as "premised upon the existence of such procedures."  *Id.* (citing *Garcia*, 890 F.2d at 776).  The court summarized the "straightforward" and "compelling" reasons for requiring a pre-deprivation procedure as follows:

> Clearly, an important liberty interest is implicated when the state determines to incarcerate a person for failure to pay a fine.  This fact, coupled with the likelihood of unconstitutional conduct in the absence of process, clearly requires the institution of some form of pre-incarceration legal process for determining the reasons for a party's failure to pay a fine.  Absent such a procedure, a government entity that immediately converts a fine into a jail term when a party fails to pay that fine deprives the imprisoned party of liberty without due process of law.  Government conduct of this sort is unlawful whatever the economic status of the incarcerated person.

*Id.* at 254.  In response to the jailer's claim that the plaintiff "elected" to lay out his fine, the court found that the plaintiff could not have "waived" a right to process of which he was never informed.  *Id.* at 255.  Further, the court found that it was the practice of jail officials to immediately incarcerate persons arrested on the authority of capiases pro fine if they could not pay the fines upon arrest, that the scope of the sheriff's grant of authority included implementation of procedures for processing persons arrested and brought to jail on the basis of capiases, and that "the sheriff's acquiescence in unsound and legally insufficient procedures effectively created a county policy for which the county is liable."  *Id.* at 256.

Turning to the case at hand, the Court finds that the authority discussed above persuades that before a person charged with a Class C, fine-only offense may be incarcerated by Hidalgo County for the failure to pay assessed fines and costs, this deprivation of liberty must be

preceded by some form of process that allows for a determination as to whether the person is indigent and has made a good faith effort to discharge the fines, and whether alternatives to incarceration are available.   Although in contrast to *Doe*, persons charged with Class C misdemeanors in Hidalgo County appear before a Magistrate before the issuance of a Class C commitment order, the absence of any inquiry into a defendant's indigency unless the defendant "raises" it of his or her own accord does not provide the process due.   It is well-settled that before a government entity may deprive a person of a constitutionally protected interest, it must provide both "notice and opportunity for hearing appropriate to the nature of the case."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).   "[P]rocess which is a mere gesture is not due process."  *Id.* at 315.   The process in place in Hidalgo County clearly risks that defendants who do not think to "speak up" during arraignment about their inability to pay fines may be jailed solely by reason of their indigency, which the Constitution clearly prohibits.  *See Doe*, 733 F.Supp. at 254 ("In the absence of some procedure for determining the reasons for a party's failure to pay a fine, it is difficult to conceive how a governmental entity will avoid discriminating against indigents on the basis of their respective economic statuses.").   By way of example, after De Luna pled guilty to the multiple charges and after Magistrate Trevino listed the multiple fines assessed, Trevino asked De Luna, "Do you have any questions?"   In Diaz's case, Magistrate Contreras simply listed Diaz's citations and then said, "Take a seat please."   Setting aside what either Plaintiff may have subjectively known at this point, the Court does not accept Defendants' suggestion that any person in this situation would articulate his or her inability to pay.   Rather, due process requires a forum in which defendants' reasons for failing to pay are considered before committing them to jail.   In sum, the County's policy of jailing individuals charged with Class C, fine-only offenses who have failed to directly inform the JP and/or

arraigning Magistrate of their indigency violates due process, and in cases where the defendant is in fact indigent, equal protection.  Even assuming that this policy is not facially unconstitutional, the County through its policymaker should have known and was and continues to be deliberately indifferent to the obvious fact that some indigent persons will not directly raise their inability to pay and will be incarcerated solely, and unconstitutionally, because they are indigent.  Thus, the County may be held liable for the policy in place.

**5.      Other Issues Raised by Parties on Liability and Damages**

Having resolved the parties' dispute as to whether an affirmative determination of indigency is required prior to incarcerating persons charged with Class C misdemeanors for nonpayment of fines, the Court now turns to Defendants' additional arguments as to why County policy did not violate the named Plaintiffs' constitutional rights.  First, Defendants contend that Diaz actually "raised" her indigency to JP Palacios through her staff, was offered and accepted community service for one of her charges, and was instructed or knew that she could obtain the same disposition of her additional charges if she alerted the arraigning Magistrate.  (Docs. 74, 105).  She did not, and therefore Defendants claim that she chose to go to jail.  *Id.*  Plaintiffs claim that Diaz and De Luna "raised" their indigency by responding to the booking form questions that they could not afford an attorney and wanted one appointed, and in De Luna's case through his mother who called JP Palacios's office.  (Doc. 90).  Defendants dispute that the booking form constitutes raising indigency and additionally argue that De Luna knew by observing another defendant at arraignment that he could avoid jail time by telling the Magistrate that he could not pay his fines.  (Docs. 74, 105).  Defendants also argue that Plaintiffs waived their right to an indigency determination by waiving the rights of which they were informed and by pleading guilty to the charged offenses.  *Id.*  As noted *supra*, Defendants also contend that

neither Plaintiff can show damages resulting from any alleged constitutional violation because Dr. Thorne could not point to any damages suffered by De Luna and his opinion regarding the damages suffered by Diaz should be excluded under Rule 702 and *Daubert*.  *Id.*

The Court will first dispose of the issues that present no genuine dispute.  Based on the evidence provided, the Court finds that Plaintiffs' answers on the booking form that they could not afford an attorney and wanted one appointed do not equate to an affirmative representation to the County, JP Palacios, or the arraigning Magistrates that they could not pay their fines;[18] for the same reason, neither De Luna nor Diaz can be held to have "waived" his or her right to an affirmative indigency determination by waiving the right to counsel at arraignment.  Generally speaking, to be enforceable, a waiver of constitutional rights must be "voluntary, knowing, and intelligently made," or "an intentional relinquishment or abandonment of a known right or privilege."  *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185-86 (1972) (internal quotations and citations omitted).  "[A] waiver of constitutional rights in any context must, at the very least, be clear."  *Fuentes v. Shevin*, 407 U.S. 67, 95 (1983).  The Court cannot accept that either Plaintiff's waiver of various constitutional rights of which they were explicitly informed constitutes a waiver of their right to a process in which the reasons for their inability to pay would be considered.  The Court also rejects Defendants' suggestion that De Luna subjectively knew that he could request an alternate sentence and chose not to do so based on an exchange that occurred between Magistrate Trevino and another defendant *after* De Luna pled guilty to the charges against him.  Finally, the Court agrees that in the complete absence of any other evidence regarding the damages suffered by De Luna as a result of his unconstitutional incarceration, Dr. Thorne's testimony that "I can't point to any damages…that I think are the

---

[18]   Notably, the record provides no evidence that JP Palacios or the arraigning Magistrates had any knowledge of Plaintiffs' responses on the form.

result of [De Luna's] being detained" forecloses an award of anything other than nominal damages for this Plaintiff.  Plaintiffs' pleading requests an award of "compensatory damages to the Named Plaintiffs only for humiliation, emotional distress and other injuries sustained by them." (Doc. 23-1 at ¶ 191).[19]  It is well-settled that a plaintiff suing under § 1983 is entitled to compensatory damages only upon proof of actual injury, and that "[m]ere proof of the violation of a [constitutional] right will not support such an award." *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir. 1980) (citing *Carey v. Piphus*, 435 U.S. 247 (1978)); *see also Brady v. Fort Bend Cnty.*, 145 F.3d 691, 718 (5th Cir. 1998) (quoting *Carey*, 435 U.S. at 264 n.20) ("The Supreme Court has long required [in § 1983 cases] that compensatory damages for emotional distress 'be supported by competent evidence concerning the injury.'").  However, a plaintiff may recover nominal damages when his constitutional rights have been violated and he is unable to prove actual injury.  *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1014-15 (5th Cir. 2003).  Therefore, the Court will award De Luna nominal damages in the amount of $1.00 for the County's unconstitutional deprivation of De Luna's liberty in violation of his due process and equal protection rights.

An issue on which a genuine dispute does exist is whether Diaz knew that she could tell Magistrate Contreras that she could not pay the fines on her three outstanding charges and obtain either a payment plan or community service.  Hernandez's and Cherry's affidavits, and the undisputed fact that prior to arraignment Diaz secured an extension for payment on another of her charges, raise a genuine fact question as to whether Diaz knew of her options or was even

---

[19]  Plaintiffs do not contest Defendants' argument that neither De Luna nor Diaz were employed at the time of incarceration, and therefore the sole basis for monetary damages is Plaintiffs' emotional distress. *See* (Docs. 74, 90, 106).

given those options on her remaining charges.[20]  If Diaz knew that she could avoid jail by stating to the Magistrate at arraignment that she could not pay the fines and intentionally chose to go to jail, this does not so much amount to waiver of the process due as it implicates whether she suffered any damages as a result of the failure to provide an affirmative indigency determination. In other words, if she chose to serve time rather than pay the accumulated fines or work the number of community service hours that would be required, she suffered no more than nominal damages as result of the County incarcerating her for failure to pay the fines without having afforded her the proper indigency screening.  The above-stated factual questions must be resolved by a jury.

Assuming that Diaz did not know of the County's policy or choose to go to jail instead of requesting an alternate sentencing, the Court turns to whether Dr. Thorne's opinion can be considered in determining her compensatory damages.  Rule 702 permits opinion testimony from a "qualified" expert if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  Defendants do not challenge Dr. Thorne's qualifications, but rather ask the Court to strike his opinion as inadmissible under Rule 702 and *Daubert* because it would not assist the trier of fact and is unreliable.  (Doc. 105).  In *Daubert*, "the Supreme Court assigned to trial courts the responsibility of determining whether expert testimony under Rule 702 is 'not only relevant, but reliable.'"  *See Hathaway v. Bazan*, 507 F.3d 312, 317 (5th Cir. 2007) (quoting

---

[20]   According to Hernandez, Cherry stated that Diaz had to pay in full or go to jail, in apparent contravention of County policy.

*Daubert*, 509 U.S. at 589).   The court determines relevance by asking whether the expert testimony will assist the trier of fact to understand or determine a fact in issue.  *See Bocanegra v. Vicmar Servs.*, Inc., 320 F.3d 581, 584 (5th Cir. 2003) (citing *Daubert*, 509 U.S. at 591-92).  The reliability determination requires the court to make "'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Hathaway*, 507 F.3d at 317 (quoting *Daubert*, 509 U.S. at 592–93).  In determining reliability, the court may consider "the extent to which a given technique can be tested, whether the technique is subject to peer review and publication, any known potential rate of error, the existence and maintenance of standards governing operation of the technique, and, finally, whether the method has been generally accepted in the relevant scientific community."  *Hathaway*, 507 F.3d at 318 (citing *Daubert*, 509 U.S. at 593-94).  "These factors are not mandatory or exclusive; the district court must decide whether the factors discussed in *Daubert* are appropriate, use them as a starting point, and then ascertain if other factors should be considered."  *Id.* at 318 (citing *Black v. Food Lion*, 171 F.3d 308, 311–12 (5th Cir. 1999)).  For example, another factor that may be considered is "[w]ether the expert has adequately accounted for obvious alternative explanations."  FED. R. EVID. 702 advisory committee's note (2000 Amendments).  The trial court should take care not to apply the reliability factors too strictly and "transform a *Daubert* hearing into a trial on the merits."  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002).  The court's role under *Daubert* is not intended to replace the adversary system:  "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"  *Id.* (quoting *Daubert*, 509 U.S. at 596).

Dr. Thorne evaluated Diaz on May 11, 2011 for approximately six hours during which time he administered the Minnesota Multiphasic Personality Iventory-2-Restructured Form ("MMPI-2-RF"), the Millon Clinical Multiaxial Inventory-Third Edition ("MCMI-III"), the Personality Assessment Inventory ("PAI"), the Child and Adolescent Self-Rating Scale, the Adolescent Self-Assessment Inventory, the Beck Anxiety Inventory ("BAI"), and the Trauma Symptom Inventory ("TSI").  (Doc. 90, Ex. 23 at Ex. A).  Based on Dr. Thorne's interview with Diaz and her mother, the results of the tests administered, and his consideration of Diaz's therapeutic "progress notes" and medical records, Dr. Thorne's report concludes that "[r]esults from the current psychological testing…are, in some ways, consistent with those individuals attempting to exaggerate the nature and severity of their psychological symptoms."  *Id.*[21]  He finds that "such possible symptom exaggeration may be attributed to her current lawsuit, her current level of psychological tension and hopelessness, a 'cry for help,' or a combination of each of these factors."  *Id.*  He further states, however, that this possibility "in no way suggests she is not currently experiencing legitimate psychological tension/stress/discomfort, and it is this examiner's opinion that Ms. Diaz has experienced a good deal of psychological tension and turmoil during (and since) the time she was detained in the Hidalgo County jail in February of 2010."  *Id.*  Dr. Thorne describes in detail the bases for this opinion, including among other things Diaz's statements to him that it "broke her heart" that her mother had to "see her in orange," that while incarcerated other inmates touched or attempted to touch her in a sexual manner, and that "the worst thing" was that her detention prevented her from graduating with her class, which "is something you can't take back."  *Id.*  Dr. Thorne concludes with the opinion that Diaz meets the diagnostic criteria for PTSD, and that "it seems reasonable to infer that Ms.

---

[21] Dr. Thorne specifies that the MMPI-2-RF should not necessarily be considered valid and the MCMI-III and PAI should not be interpreted due to the possibility that Diaz was exaggerating her psychiatric symptoms.  (Doc. 90, Ex. 23 at Ex. A).

Diaz's current psychological distress/impairment (as well as social impairment) is, at least in part, the result of her emotional response to having been detained," "though it should also be acknowledged that various other stressors and psychological factors (*e.g.*, her personality structure and various cognitive patterns developed, in large part, prior to the alleged assault/harassment, her history of substance abuse, and various family issues/conflicts) may also be negatively impacting Ms. Diaz's current functioning." *Id.* Further, "despite attempts to manage/treat her various stressors/symptoms associated with the trauma resulting from her…detainment, it seems likely the trauma experienced…has *significantly* impacted her life and functioning." *Id.* (emphasis in original).

Defendants do not attack the methodology or techniques used by Dr. Thorne in arriving at this opinion, but instead challenge the opinion on two main grounds: (1) Diaz's lack of credibility; and (2) Dr. Thorne's inability to say with any reasonable degree of medical or scientific certainty that any of the psychological symptoms suffered by Diaz were proximately caused by her incarceration. (Doc. 105). At Dr. Thorne's deposition, Defendants confronted him with records demonstrating that subsequent to Diaz's detention, no mental health provider had noted her incarceration or that it had affected her in a negative way until she spoke to Dr. Thorne in the context of this lawsuit. (Doc. 105, Ex. B at pp. 74-97). Defendants also pointed out to Dr. Thorne that after the date of his evaluation, Diaz testified in her deposition that she did not trust anyone, even her psychologist, to which Dr. Thorne responded that he would "like to explore that with her more" and could not "rule out" that she may have been telling him a story to accomplish a goal in this lawsuit. *Id.* at pp. 178-81. Defendants further directed Dr. Thorne to Diaz's interrogatory response that she suffered no physical harm, which Defendants claim conflicts with her statements as reflected in the report. (Doc. 105; Doc. 105, Ex. B at p. 157; *see*

*also* Doc. 74, Ex. E at Response to Interrogatory No. 11).   Defendants characterize all of the above as casting doubt on Diaz's credibility and therefore the bases on which Dr. Thorne formulated his opinion, thus warranting exclusion of his opinion under Rule 702 and *Daubert*. (Doc. 105).   The Court agrees that Diaz's previous records, lack of trust, and interrogatory response are relevant, in varying degrees, to assessing her credibility, but cannot accept Defendants' position that Dr. Thorne's report is therefore inadmissible.   Had Dr. Thorne disregarded the possibility that Diaz was exaggerating the nature of her symptoms in formulating his opinion, the Court might find otherwise, but in fact Dr. Thorne repeatedly recognized this possibility and in doing so "has adequately accounted for obvious alternative explanations," itself a factor used to determine reliability.   The Court cannot take on the role of fact-finder in fulfilling its role under *Daubert*, and must allow the jury to determine Diaz's credibility and the weight to be given to Dr. Thorne's report.   In this regard, Defendants' use of the adversary process can adequately address their concerns.

Defendants also attack the reliability of Dr. Thorne's opinion on the basis that he cannot say with the requisite degree of certainty that Diaz's time in jail is the proximate cause of any emotional distress.   (Doc. 105).   In doing so, Defendants chiefly cite to the substantive law of Texas which does not apply in a § 1983 case.   *See id.*   In any event, the Court finds that Dr. Thorne's opinion that some of Diaz's reported symptoms were at least in part due to her emotional response to her detention is based on reliable methods of psychological evaluation. Further, Dr. Thorne stated in his deposition, consistent with his report, that "I think [Diaz] has PTSD, and I think part of her trauma response and part of her current psychological functioning is *undoubtedly* related to that detainment."   (Doc. 105, Ex. B at p. 133) (emphasis added). Therefore, Dr. Thorne has not, as Defendants allege, failed to state that Diaz's incarceration was

more likely than not a factual cause of her alleged harm.  (Doc. 105); *see* RESTATEMENT (THIRD) OF TORTS § 26 cmt. l (2007) ("So long as the defendant's tortious conduct was more likely than not *a* factual cause of the harm, the plaintiff has established the element of factual cause.") (emphasis in original).[22]  It is worth noting here that although corroboration through expert or other testimony may often be required, "in certain cases a plaintiff's testimony alone may be sufficient proof of mental damages" in a § 1983 case.  *Brady*, 145 F.3d at 720.  Although they fail to do so with respect to De Luna, Plaintiffs point to some deposition testimony by Diaz and statements by her mother that are relevant to her claimed damages.  (Doc. 90, Ex. 21 at ¶ 5; Ex. 28 at pp. 162-65; *see also* Doc. 111, Ex. B at pp. 251-52).  This evidence can be better considered by a jury, and tested by Defendants, if accompanied by Dr. Thorne's *admission* that other stressors and psychological factors may also be negatively impacting Diaz's current emotional state.  In sum, Dr. Thorne's opinion is sufficiently reliable to be admitted and also relevant, in that it will assist the jury in determining the degree to which Diaz suffered damages as a result of her incarceration.  Therefore, the Court will not strike his opinion and will allow the issue of Diaz's damages to be determined by the fact-finder.

## IV.    Conclusion

For the foregoing reasons, the Court hereby **ORDERS** that Defendants' Motion for Denial of Class Certification (Doc. 87) is **GRANTED** and Plaintiff's Motion for Class Certification and Appointment of Counsel (Doc. 91) is **DENIED**.

The Court further **ORDERS** that Defendants' Motion for Summary Judgment (Doc. 74) is **GRANTED IN PART** as to the named Plaintiffs' claims for declaratory and injunctive relief against the individual Defendants and the County and Plaintiff De Luna's claim for

---

[22]  Although Defendants generally argue that Dr. Thorne's opinion does not meet the test for proximate cause under Texas law, they focus on the "cause in fact" element of that test.  (Doc. 105).

compensatory damages against the County.   In all other respects, Defendants' Motion for Summary Judgment is **DENIED**.

The Court further **ORDERS** that Plaintiffs' Motion for Summary Judgment (Doc. 90) is **GRANTED IN PART** as to Plaintiffs' claims that the County violated their federal due process and equal protection rights by failing to conduct an affirmative indigency determination before incarcerating them for nonpayment of fines and costs.   In all other respects, Plaintiffs' Motion for Summary Judgment is **DENIED**.

The Court further **ORDERS** that Plaintiff De Luna is entitled to recover nominal damages in the amount of $1.00 resulting from the County's deprivation of his constitutional rights.

Plaintiff Diaz's claim for compensatory damages presents genuine issues of material fact that cannot be resolved on summary judgment.

SO ORDERED this 15th day of February, 2012, at McAllen, Texas.

Randy Crane
United States District Judge